CLERK'S OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED

MAY 21 2010

JOHN F. CORCORAN, CLERK
BY: [signature]
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
LYNCHBURG DIVISION

| | |
|---|---|
| BEDFORD GENEALOGICAL SOCIETY, INC., *Plaintiff,* | CIVIL ACTION NO. 6:09-cv-00060 |
| v. | MEMORANDUM OPINION |
| BEDFORD MUSEUM AND GENEALOGICAL LIBRARY, *Defendant.* | JUDGE NORMAN K. MOON |

Plaintiff, Bedford Genealogical Society, Inc. ("BGSI"), filed a complaint alleging unfair competition/false designation of origin and trademark infringement in violation of the Lanham Act; the complaint also alleges Virginia common law counts of unfair competition and conversion. BGSI's suit is based on claims that it is the successor in interest to an unincorporated association, the Bedford Genealogical Society (the "Society"). Defendant, the Bedford Museum and Genealogical Library (the "Museum"), filed a motion to dismiss pursuant to Rules 12(b)(1) and (6) of the Federal Rules of Civil Procedure. The parties have fully briefed their positions on the motion and presented their arguments at a hearing on May 14, 2010. As stated on the record at the hearing, and as explained herein, BGSI has failed to show that it is the successor in interest to the unincorporated association, the Society, and therefore lacks standing to bring the complaint. Accordingly, the court lacks subject matter jurisdiction in this matter, and the Museum's motion to dismiss (docket no. 6) pursuant to 12(b)(1) was granted.

## I. FACTUAL BACKGROUND[1]

BGSI is a Virginia not-for-profit corporation located at 1318 Glenwood Drive in Bedford, Virginia, and was incorporated in February 2009. The Museum is a Virginia not-for-profit corporation that was incorporated in September 1978 and opened at 201 E. Main Street in Bedford, Virginia in July 1979. According to BGSI, the Society "was formed in early 1988 as an unincorporated association. . . . intended to be a self-supporting affiliate of the . . . Museum. . . ." Article I of the Society's by-laws recognizes that the Society is an "affiliate" of the Museum. The Society's purpose was to help the Museum answer genealogical inquiries and to perform genealogical research on a volunteer basis.

In February 1988, the Society sought permission from the Museum's Board of Directors to amend the Museum's charter to allow the Society to collect membership dues. In return for the Society's use of the Museum's equipment and utilities, its facility for meetings, and the assistance of the Museum's staff, the Society agreed to provide "payment-in-kind" to the Museum in the form of continued volunteer work and donations of funds, equipment, records, and materials. In May 1988, the Museum's Board of Directors granted the Society's request and amended the Museum's Articles of Incorporation to allow for members. Thereafter, the Society utilized the Museum's 501(c)(3) tax exempt status and began collecting dues from its members.

According to BGSI, the Society and the Museum entered into an agreement on August 3, 1988 (the "1988 Agreement"), "which sets forth the terms under which each entity would operation." BGSI describes the 1988 Agreement as indicating that "BGS was formed to, among other things: organize, index and maintain certain Bedford County genealogical records; compile

[1] The facts have been adduced from the record presently before the court, and are undisputed unless noted otherwise.

and maintain information about family grave plots in Bedford County; and edit and publish Bedford County genealogical data and other research." From 2005 to 2008, the Society consistently identified the following as a "Focus item" on its meeting agenda: "Purchase and provide genealogical and historical documents, books and information for the Bedford City/County Museum Research Room." BGSI asserts that the 1988 Agreement provides that "[m]aterials purchased or acquired by the Society, as well as copyrights obtained for original publications, shall be assets of the Society." Pursuant to Article VI, Section 5, of the Society's bylaws, the Society Librarian is responsible for receiving all donations of printed materials for the Museum library, and pursuant to Article XII of the bylaws, upon dissolution of the Society, all "assets held by the Society shall accrue to the benefit of the Bedford City/County Museum."

Effective January 1, 2009, Larry Lynch became President of the Society. On January 10, 2009, the Society held its regular meeting. At this meeting, Lynch proposed new Society bylaws to be voted on at the next regular meeting (the "Proposed New Bylaws"). The Proposed New Bylaws sought to empower the Executive Board to "transact any necessary business occurring between regular meetings," "have control and managements of the affairs, funds and tangible and intangible assets of the Society," and "select a financial institution to serve as the banking facility for the Society." The Proposed New Bylaws also sought to establish that "any publication, including the Bedford Genealogical Society Quarterly, is copyrighted material and is owned by the Society," and to replace the dissolution provision in Article XII of the By-Laws (specifying that all Society assets go to the Museum) with a new dissolution provision that "all assets remaining after paying all debts and obligations, shall be distributed and given over" to some other unspecified "non-profit fund, foundation or association in Bedford City or County." The Proposed New By-Laws never were approved or adopted.

On February 11, 2009, an e-mail message was sent to certain members of the Society, describing the next regularly scheduled meeting, to take place on February 14, 2009, as an "important business meeting," and stating that "all are encouraged to attend." BGSI does not dispute that many members of the Society did not receive the e-mail of February 11, 2009, and that those who received it were not advised of the nature of the "important business" that was to take place at the meeting. The Society has more than 167 members throughout the United States, and BGSI does not dispute that many members of the Society did not receive the e-mail of February 11, 2009, including individuals from Virginia, Kentucky, New York, Maryland, Georgia, Kansas, Ohio, West Virginia, North Carolina, California, New Mexico, Washington, Arizona and Texas.

Approximately 30 to 40 individuals attended the Society meeting on February 14, 2009.[2] There was a vote to incorporate (which apparently presented more than two choices, one of which was to incorporate), and the attendees present at the meeting did not unanimously vote to incorporate.

Members of the Society continue to meet as a group at the Museum and carry out genealogical activities, independent of BGSI. BGSI claims that the Society's property at the Museum, including ""'cemetery records, notebooks, maps, scanner, projection screen, books, surname files and newsletters," now belongs to BGSI, and that the Museum has infringed upon

---

[2] Some were new members who appeared for the first time, paid their dues, and joined the Society, including a Mr. Rakes, who introduced himself to the attendees as a lawyer and spoke about the benefits of incorporation. Rakes explained that because the Society was not yet a legally recognized entity its members could be sued individually for their efforts on behalf of the Society, and he offered incorporation as the solution to make the Society "bulletproof."

Unbeknownst to most other members of the Society, aside from Larry Lynch and the five other Society members who he had named as Directors of BGSI, BGSI had been incorporated on February 6, 2009, five days before the e-mail of February 11, 2009, and a week before the meeting on February 14, 2009. BGSI's address is 1318 Glenwood Drive in Bedford, which apparently is Lynch's home address.

BGSI's property rights.

## II. Standard of Review

The Museum moves to dismiss the complaint for lack of standing, and a motion to dismiss for lack of standing attacks the district court's subject matter jurisdiction. *See Allen v. Wright*, 468 U.S. 737, 750 (1984) (federal courts are under an independent obligation to examine their own jurisdiction, and standing "is perhaps the most important of [the jurisdictional] doctrines"); *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990) (same); *U.S. v. Hays*, 515 U.S. 737, 742 (1995) (same); *Falwell v. City of Lynchburg, Virginia*, 198 F. Supp. 2d 765, 771 (W.D. Va. 2002) (because standing is a core element of federal subject matter jurisdiction, it is subject to the same standard of review that applies to a motion to dismiss for lack of subject matter jurisdiction under Fed. R. Civ. Proc. 12(b)(1)). Rule 12(b)(1) of the Federal Rules of Civil Procedure permits a party to move for dismissal of an action based on lack of subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1).

A plaintiff "has the burden of proving that subject matter jurisdiction exists." *Evans v. B. F. Perkins Co.*, 166 F.3d 642, 647 (4th Cir. 1999) (citing *Richmond, Fredericksburg & Potomac R.R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991)). In considering a motion to dismiss pursuant to Rule 12(b)(1), the court must accept as true all material factual allegations in the complaint and must construe the complaint in favor of the plaintiff. *Warth v. Seldin*, 422 U.S. 490, 501 (1975). A court should "regard the pleadings as mere evidence on the issue, and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment." *Evans*, 166 F.3d at 647. (internal citation omitted). The moving party's motion to dismiss should be granted when "the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." *Id.* (internal citation omitted).

## III. DISCUSSION

The burden is on BGSI to establish that it is the successor in interest to the Society. Because BGSI cannot satisfy this burden, it cannot satisfy the initial "injury in fact" requirement for Article III standing.[3] The unilateral acts of certain Society members – without notice to or the knowledge or consent of the entire membership – in forming a corporation of the same name did not transfer the assets or members of the unincorporated association to the corporation.[4] The attempt to incorporate the Society as "BGSI" was invalid because it was done without (1) notice and (2) the unanimous consent of the Society's membership. These material jurisdictional facts are not in dispute. The Society's full membership never received any notice of the vote to incorporate; only 33 out of 148 members (22% of the membership) attended the February 14, 2009, meeting where this vote occurred; and 3 of the 33 members in attendance voted against incorporation. While BGSI appears to have incorporated, there is nothing to support the conclusion that the Society no longer exists or that BGSI has a valid claim to the Society and its assets.[5] The Society's members located throughout the United States at the time BGSI was

---

[3] A party seeking to invoke a federal court's jurisdiction must demonstrate: (1) injury in fact; (2) a causal relationship between the injury and the challenged conduct; and (3) a likelihood that the injury will be redressed by a favorable decision. *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982).

[4] BGSI states that the Society was an "unincorporated association" at the time of the incorporation vote and purported ratification motion on February 14, 2009, and the Museum accepts such characterization for purposes of the instant motion. An unincorporated association is a collection of individuals gathered for a common purpose and "is not a legal entity separate from the persons who compose it." Black's Law Dictionary, association (8th ed. 2004); *see also Yonce v. Miners Memorial Hospital Ass'n*, 161 F. Supp. 178, 186 (W.D. Va. 1958) (describing an unincorporated association as "a voluntary group of persons joined together by mutual consent for the purpose of promoting some stated objective"). Virginia law provides that unincorporated associations may sue or be sued in their own name, but does not otherwise alter the legal definitions of such groups. *See* Va. Code § 8.01-15.

[5] The dispute is not whether BGSI was formed as a corporation under Virginia law. Rather, the Museum's argument, which is supported by Virginia law, is that the formation of BGSI cannot transfer to BGSI all the claims and assets of the Society when the members of the Society did not receive adequate notice of the incorporation, much less give adequate consent. BGSI argues that, because Virginia law permits incorporation, and BGSI's (continued...)

formed received no notice of an intent to incorporate.[6] Rather, only certain members received

---

[5](...continued)
incorporation followed those rules, then BGSI is automatically the Society's successor. This argument fails, however, because it confuses incorporation with being a successor in interest. Incorporation is a fairly simple act that brings an entity into existence, but it does not mean that the incorporator can become a successor in interest, without proper notice to and consent of the association, to the rights and property of the individual members. BGSI is quite likely a duly formed corporation, but it is not the Society, and it is not at present a successor in interest to the Society.

[6] BGSI contends that sufficient notice was provided to the Society's membership by the following: the meeting of February 14, 2009, was a regularly scheduled meeting; notice of the meeting was provided on the Web-site, BGSociety.org; the meeting was announced in the Society's February 2009 newsletter; the meeting was announced in the "events" sections of the February 11, 2009, issues of the *Bedford Bulletin* (a weekly newspaper published in Bedford), the Smith Mountain Eagle (a weekly newspaper serving the Smith Mountain Lake area), and the February 10, 2009, issue of the *Lynchburg News & Advance*; and that an e-mail notification of the meeting was sent on February 3, 2009, to all members of the Society "who subscribe to the webpage, Rootsweb." However, notice did not go out to the entire membership, as it did regarding other important matters undertaken at the Society's meetings, and none of these notices of the regular meeting referred in any way to incorporation.

Plaintiff states that the unincorporated association's bylaws provide that seven members of the Society constitute a quorum for meetings, that 33 members of the Society attended the meeting, 30 of whom voted in favor of incorporation, and that,

> [a]fter the vote was taken; President Larry Lynch told the membership that a committee of the Society's officers and other members had already incorporated the organization and that the charter for Bedford Genealogical Society, Inc. had already been issued by the Virginia State Corporation Commission. . . .
>
> A member then made a motion to have the membership ratify the acts already taken by the officers and members to incorporate in order for the Society to continue to pursue 501(c)(3) tax exempt status. The motion was seconded and passed unanimously. . . .
>
> * * *
>
> As Mr. Lynch recounts in detail in his Declaration, the Society's effort to obtain tax exempt status, potentially involving incorporation, went back to 2008. . . . A unanimous vote of the members attending a March 2008 meeting authorized Lynch to begin pursuing tax exempt status. Over the next year, these efforts were reported to the Society's members in subsequent monthly meetings and in newsletters. . . .
>
> Thus, by the time the Society met on February 14, 2009, ample notice had been provided to the Society's members that the Society might incorporate. . . .

(Internal citations omitted.) However, because the minority group in attendance at the meeting had no authority to incorporate, it could not have ratified the unauthorized actions of the contingent who formed BGSI and appointed themselves as "Initial Directors" on February 6, 2009. The incorporation vote and the purported ratification are null and void as to the Society. The record indicates that approximately 78% of the Society's membership did not attend the meeting. There is nothing in the record to establish that these absent members received notice, or relinquished their rights as members of an unincorporated association to receive notice and to
(continued...)

the e-mail of February 11, 2009, and that e-mail did not provide any further information concerning the nature of the "important business" to be conducted three days later. Less than a third of the Society's membership attended the meeting, and several of those in attendance dissented and voted against incorporation.

Neither the governing documents of the Society nor any applicable statutes provide for incorporation of the Society with less than unanimous consent of all its members, and thus unanimous consent was required. *See Miller v. Intl. Union of United Brewery, Flour, Cereal, and Soft Drink Workers of America*, 187 Va. 889 (1948) (recognizing that mere majority vote to incorporate cannot extinguish an unincorporated association); *Phillips v. Widow's Son Lodge No. 54, A. F. & A. M.*, 152 Va. 526 (1929); *Griffin's Ex'r v. Macaulay's Adm'r*, 7 Gratt. 476, 1851 WL 2856 (Va. 1851) ("Dismal Swamp Land Company, which was not incorporated until 1814," had no right "to ask for execution of a trust made for the benefit of an unincorporated association in 1797" without showing "that the present corporation has succeeded to the rights of the association or partnership." "Acts of incorporation" do not "transfer the debts due to the association to the company incorporated by them"; transfer is invalid absent words "on the face of the charter" plus inclusion of "exactly the same individuals who constituted the association"). Although BGSI characterizes these cases as "old," it offers no cases to the contrary, and the fact that there are few recent cases simply suggests that the principle is well-settled.

Indeed, it is black-letter law that "[n]otice of an intention to incorporate an association must be given, and no member of an association can become a member of the corporation

[6](...continued)
oppose incorporation, or that the absent members agreed to vest in anyone else the right to determine whether the Society should incorporate.

without his or her knowledge or consent." 7 Corpus Juris Secundum *Associations* § 106 (2004); *see also C.P. DeBruyn v. Golden Age Club of Cheyenne*, 399 P.2d 390 (Wy. 1965) (members of splinter group, who left unincorporated association and attempted to form corporation under the same name, and for the same purpose, abandoned any right or interest they had in the association and had no right to use the association's name); *Martinek v. Zarovy*, 48 N.E.2d 760 (Ill. App. Ct. 1943) (same); *Hamaty v. St. George Ladies Soc.*, 181 N.E. 775 (Mass. 1932) (attempt to incorporate association was invalid where all members were not given notice and did not consent to incorporation in advance); *Great Council of Improved Order of Red Men of State of New Jersey v. Mohican Tribe No. 64*, 114 A. 440 (N.J. Ch. 1921) (attempt to incorporate existing association was ineffectual; holding that "an association cannot be incorporated, cannot be changed into a corporation instead of an association, without the consent of every one of the members, at least unless there be in the contract of association, or the statute law of the sate, some provision enabling it to be done without the consent of all.").[7]

Applying these precedents to the facts of this case, it is clear that BGSI's attempt to incorporate the Society was invalid. BGSI raises no serious dispute that it failed to notify all of the members of the Society before forming BGSI and conducting the incorporation vote and

[7] *See also SKF Employees Assoc. v. Root et al.*, 57 Pa. D. & C. 12, 1947 WL 2619 at *8 (Pa. Com. Pl. 1946) (holding that where officers and majority of members of local labor union voted to merge with national union, they were not permitted to take with them the property and assets of the unincorporated local union where a minority of the members objected to the merger: "It has long been the settled law that even a majority of the members of an unincorporated association cannot withdraw therefrom and form a new association taking with them the property of the old organization if there be any members who dissent." ); *Balukonis v. Lithuanian Romanian Catholic Benefit Soc'y of the Most Sacred Heart of Jesus*, 172 N.E. 505 (Mass. 1930) (purported incorporation of unincorporated association as ineffectual where it was not subject o notice and vote at annual or semi-annual meeting, as required by association's written constitution); *Scott v. York Woods Cmty. Assoc.*, 768 N.E.2d 847 (Ill. App. Ct. 2002) (where state statute provided for incorporation of existing unincorporated association "by the same procedure and affirmative vote of its voting members or delegates as its constitution, bylaws, or other fundamental agreement requires for an amendment to is fundamental agreement," and that procedure was not followed by members seeking to incorporate community association, association was not validly incorporated).

subsequent ratification motion, nor that it failed to obtain unanimous consent.[8] Instead, the five members of the Society who became BGSI's directors unilaterally made the decision to incorporate, without consent of, or even notice to, the full membership of the Society. However, because neither the Society's governing documents nor any Virginia statute allowed for incorporation without the full consent of the membership, unanimous consent was required. *Great Council of Improved Order of Red Men of State of New Jersey*, 114 A. at 443 ("an association cannot be incorporated, cannot be changed into a corporation instead of an association, without the consent of every one of the members, at least unless there be in the contract of association, or the statute law of the state, some provision enabling it to be done without the consent of all."). The record further demonstrates that the Society is able to communicate to its full membership, but that this was not accomplished with any notice of intent to vote on incorporation.

Because there was no unanimous consent from the Society members, BGSI cannot be the successor in interest to the unincorporated association. According to well-established precedent, "where an attempt to incorporate an existing unincorporated association, or to merge such association into a corporation, is ineffectual, such action does not affect the existence or property of the association." 7 Corpus Juris Secundum § 106 (2004); *see also Ozark County School Dist. R-V of Ozark County v. Lay*, 358 S.W.2d 77, 81 (Mo. Ct. App. 1962) (action of unidentified persons in organizing corporation under same name did not terminate or destroy independent continued existence of the unincorporated association and did not work transfer or conveyance to

[8] The minutes of the meeting of February 14, 2009 (BGSI's own evidence, submitted as an exhibit in support of Lynch's declaration), memorializes the failure to provide notice and obtain unanimous consent, given that Lynch announced during the meeting "that the program scheduled for today . . . had been changed" to an incorporation vote, that only 33 out of 148 members attended the meeting, and that 3 of the 33 members in attendance voted against incorporation.

corporation of title to, or any interest in, association's property or assets); *Hope v. Alabama Lodge of Odd Fellows*, 103 So. 54 (Ala. 1925) (where incorporation is participated in and authorized by less than a majority, the legal title of properties remains in trust for the majority of membership, or in abeyance for the unincorporated association); *Great Council of Improved Order of Red Men of State of New Jersey*, 114 A. at 444 (where incorporation was ineffectual, title to the association's property remained in trust for the members of the association); *Schiller Commandery, No. 1, United Friends of Michigan v. Jaennichen*, 74 N.W. 458 (1898) (where the action to incorporate is not unanimous, property of the unincorporated association is not vested in the newly formed corporation).

Even were unanimous consent not required, the undisputed facts in this case disclose that notice of the meeting was deficient, because it did not reach all Society members, and it did not describe the specific purpose of the meeting and the extraordinary matters to be attended to at the meeting. Due notice requires that each member receive notice of the existence, timing and specific purpose of the meeting. *Miller*, 187 Va. at 899 (citing C.J.S. Corporations in noting that notice of the "nature of the business to be transacted" "must be given" where the business is "of importance," which includes amendment of bylaws). BGSI's argument regarding notice is that members generally knew the time and place of all regular meetings, so they had notice. However, standing notice of the time and place of the regular meeting, or notice of unspecified "important business" to be conducted at a regular meeting, sent only to a subset of the membership and without any explanation of the "important business" to be transacted, is deficient. *See Great Council of Improved Order of Red Men of State of New Jersey v. Mohican Tribe, No. 64, Improved Order of Red Men*, 92 N.J. Eq. 593, 114 A. 440 (1921) (holding that, to be sufficient notice, it must be sent to "all members on the roll," and noting that there was no

difficulty or question as to who composed the membership). And notice necessarily includes disclosure of the nature of the business to be transacted. *See Miller*, 187 Va. at 899 (describing types of extraordinary business).[9]

Accordingly, BGSI lacks standing to bring the instant complaint.[10]

## IV. CONCLUSION

For these reasons, Defendant's motion to dismiss (docket no. 6) was granted at the close of the May 14, 2010, hearing in this matter.

The Clerk of the Court is hereby directed to send a certified copy of this memorandum opinion and the accompanying order to all counsel of record.

Entered this 21st day of May, 2010.

NORMAN K. MOON
UNITED STATES DISTRICT JUDGE

[9] BGSI mentions earlier action in March 2008 as vesting in a committee the authority to investigate tax-exempt status and "possibly incorporate." (Lynch Declaration.) In fact, Lynch's declaration reveals that the committee was to "draft a Constitution and new Bylaws," not execute them. The authority granted the exploratory committee cannot be construed to authorize a minority to secretly incorporate and install themselves as directors for multiple year terms in violation of the existing bylaws. BGSI argues various sources of authority for the incorporation – the bylaws, a "supermajority" vote, the "ratification" motion, or perhaps a discussion in 2008 regarding tax-exempt status and incorporation – yet none of these actions authorizes the actions of February 14, 2009. Without such authority, there is no consent, and without consent, the members of the Society cannot be disfranchised or forced into the new entity. "[N]o member of a voluntary association can be forced into a corporation against the member's consent, express or implied." 8 Fletcher Cyc. Corp. § 3994 (2010); *see also Great Council of Improved Order of Red Men of State of New Jersey v. Mohican Tribe, No. 64, Improved Order of Red Men*, 92 N.J. Eq. 593, 114 A. 440 (1921) (holding it is "elemental" that "a man cannot become a member of a corporation without his consent").

[10] It is not necessary for me to make a final determination about the status of the Society; however, it is apparent that the Society may still exist.